IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Friends of Congaree Swamp, <u>et al.</u>, | ) | |
| | ) | C/A No. 3:10-CV-2394-MBS |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| Federal Highway Administration, <u>et al.</u>, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

    In this action, Friends of Congaree Swamp, the South Carolina Wildlife Federation, and the

National Audubon Society (together, "Plaintiffs") challenge the decision of the Federal Highway

Administration ("FHWA"), FHWA Division Administrator Robert L. Lee (together, the "Federal

Defendants"), and South Carolina Department of Transportation Secretary Robert St. Onge, Jr.[1] (the

"SCDOT Secretary," together with the Federal Defendants, "Defendants") "to authorize, fund and

otherwise pursue construction of new bridges and expanded causeways on U.S. Highway 601 within

the Congaree River floodplain and within the authorized boundaries of Congaree National Park" (the

"U.S. 601 Project" or the "Project"). Compl. ¶ 1, ECF No. 1. The Court heard oral argument on the

parties' cross-motions for summary judgment on April 7, 2011. For the reasons that follow, the

Court hereby DENIES Plaintiffs' motion for summary judgment, ECF No. 95, and GRANTS the

cross-motions filed by Defendants, ECF Nos. 99 & 100.

_____

[1]     The parties jointly moved to substitute Mr. Onge for his predecessor in office,
H.B. Limehouse. <u>See</u> Order, ECF No. 102.

I.      **FACTS AND PRIOR PROCEEDINGS**

In 1976, "[i]n order to preserve and protect for the education, inspiration, and enjoyment of present and future generations an outstanding example of a near-virgin southern hardwood forest situated in the Congaree River floodplain," the United States Congress declared a large portion of the Congaree River floodplain, the "Congaree Swamp National Monument." Pub. L. No. 94-545, 90 Stat. 2517 (1976). In 1988 Congress enlarged the authorized boundary of the Congaree Swamp National Monument and, in 2003, designated the Congaree Swamp National Monument as the Congaree National Park ("Congaree National Park" or the "Park"). See Pub. L. No. 100-524, 102 Stat. 2606 (1988); Pub. L. No. 108-108, § 135, 117 Stat. 1241 (2003).

The majority of the U.S. 601 Project is located on a right-of-way owned by Defendants that runs through the Congaree River floodplain. 2009 EA at 2, Admin. R. 3829. The area "has been utilized as a direct roadway corridor with bridging since the 1920's, fifty years prior to the establishment and protection of the Congaree Swamp." 2009 EA at 4, Admin. R. 3831. The Project would replace four bridges, all of which were originally built in the 1940's and are now classified as "structurally deficient and functionally obsolete, meaning that they have significant safety and repair needs and are insufficient for the traffic volume they carry." S.C. Admin. Law Ct. Am. Final Order & Decision 5, Admin. R. 3449.

When the original bridges were built, "[t]he crossing of the Congaree River floodplain was accomplished mostly by filling of floodplain wetlands to construct [approximately three miles of earthen] causeways." Compl. ¶ 36, ECF No. 1.[2] The Project will replace Bridge One in essentially

_____

[2]      See also 2009 EA at 4, Admin. R. 3831 ("Due to the fact that the majority of the project corridor is located within the Congaree River floodplain; it has been constructed on embankment to prevent the roadway from overtopping during

the same location as the current bridge, with the replacement bridge being "slightly longer to avoid conflicts with the existing bridge." 2009 EA at 13, Admin. R. 3840.[3] A temporary detour bridge will be erected immediately to the east of the original Bridge One during construction so as avoid interruption with traffic. Id. The shift in alignment will require that some wetlands be filled. At the same time, Defendants intend to reclaim the wetlands that were previously filled to support the original Bridge One "by removing the embankment and restoring the site as close as possible to its original condition. No new right of way [will] be required." Id. Bridges Two, Three, and Four will be replaced approximately 45 feet to the west of their current alignment so as "to facilitate construction of a new bridge while maintaining traffic on the existing bridge." Id. at 14, Admin. R. 3841. As with Bridge One, the other replacement bridges will be slightly longer than the original bridges. Id. SCDOT also similarly "intends to remove the existing embankments to the current elevation of the wetlands in the vicinities of the shifts in alignment[.]" Id. In total, the Project will require the filling of 8.22 acres of wetland and will restore approximately 7.32 acres of wetlands that were previously filled to support the original bridges and roadway. The net impact of newly filled wetlands will therefore be approximately .9 acres. See U.S. 601 Wetland Impact Summary, Admin. R. 3577.[4]

---

       flooding events. This embankment ranges from 13 feet in height near the intersection with S.C. Route 48 to over 40 feet near the Congaree River.").

[3]     Throughout the administrative record, the bridges are referred to as Bridges One, Two, Three, and Four, with Bridge One being the most northern and Bridge Four the most southern. See 2009 EA at 4, Admin. R. 3831.

[4]     As originally designed, the Project called for the filling of 8.23 acres of wetlands and the restoration of 5.99 acres, for a net impact of newly filled wetlands of 2.24 acres. See FONSI 6, Admin. R. 4933. However, the Project has since been modified and, at the hearing on the motions for summary judgment, the parties

Defendants began technical environmental studies in preparation for the Project in 2003. See 2009 EA Project Background, Admin. R. 3823. A public information meeting was held on May 18, 2004. Id. The first Environmental Assessment (the "2005 EA") was signed on March 23, 2005. Id. A public hearing was conducted on May 3, 2005. Id. In June 2005, Defendants began the process of obtaining the necessary permits for the Project. From the Army Corps of Engineers (the "Corps"), Defendants applied for a Section 404 Permit, required because the proposed Project involved placing fill material in wetlands. At the same time, Defendants submitted a joint application to the South Carolina Department of Health and Environmental Control ("DHEC") for a Section 401 Water Quality Certification ("Section 401 Permit"). See 2009 EA Background, Admin. R. 3823. In November 2005, FHWA issued a Finding of No Significant Impact ("FONSI"), reflecting its conclusion that the Project would have no significant impact on the quality of the environment. Id. On June 23, 2006, DHEC issued the Section 401 Permit. See S.C. Admin. Law Ct. Am. Final Order & Decision 1, Admin. R. 3445. Its decision was promptly challenged by two petitions, one filed by Plaintiffs and the other by SCDOT,[5] both of which requested a contested hearing on the matter pursuant to the South Carolina Administrative Procedures Act, S.C. Code Ann. §§ 1-23-310, et seq. S.C. Admin. Law Ct. Am. Final Order & Decision 1, Admin. R. 3445. The petitions were consolidated into a single case.

---

agreed that the figures recited above accurately reflect that modification.

[5]    SCDOT's petition challenged DHEC's decision on the following narrow grounds: (1) "DHEC failed to meet the applicable regulatory time periods to issue the Certification and/or Permit"; (2) "[t]he 401 Water Quality Certification should have been issued without a condition for additional bridging"; and (3) "DHEC imposed conditions that do not accomplish an objective related to the project proposed by [SC]DOT." S.C. Admin. Law Ct. Am. Final Order & Decision 1–2, Admin. R. 3445–46.

On September 12, 2006, while the administrative action was pending, Plaintiffs filed their first suit in this Court challenging the sufficiency of Defendants' environmental analysis of the Project.  In Friends of Congaree Swamp et al. v. South Carolina Department of Transportation et al., No. 3:06-CV-02538-MBS ("Friends of Congaree I"), Plaintiffs alleged that SCDOT and FHWA[6] violated the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321 et seq., by failing to: (1) "consider a reasonable range of alternatives in the EA and . . . properly assess the alternatives presented"; (2) "analyze adequately the environmental impacts of the U.S. 601 Project, including both direct and indirect impacts"; (3) "properly consult and coordinate" with "federal and state agencies and others"; and (4) comply with "Section 4(f) of the Department of Transportation Act of 1966, . . . [which] requires the Defendants to undertake an analysis of feasible and prudent alternatives and undertake all possible planning to minimize harm when a highway project involves publicly owned parks such as Congaree National Park."  Compl. 13, 15–16, ECF No. 1 (No. 3:06-CV-02538-MBS).    Plaintiffs sought declaratory relief and a permanent injunction to halt construction.  Id. at 16.

On October 16–18, 2007, a hearing on the merits of the DHEC's decision to issue the Section 401 Permit was held before Administrative Law Judge Ralph King Anderson III (the "ALJ").  See S.C. Admin. Law Ct. Am. Final Order & Decision 1–2, Admin. R. 3445–46.  The ALJ issued a final order on March 7, 2008, rejecting the challenges to DHEC's decision to issue the permit.  Specifically, the ALJ found that,

There are two distinct environmental issues presented by Respondents in this

---

[6]      The named defendants in Friends of Congaree I were SCDOT, its then-Executive Director Elizabeth Mabry, FHWA, and FHWA Division Administrator Robert L. Lee.  See Compl., ECF No. 1 (No. 3:06-CV-02538-MBS).

case—the impact that the proposed project will have to the area and the desire to have the impact of the existing causeway either lessened or eliminated. . . .

If the issue was the filling of the wetlands to create four new bridges, the impact to the wetlands would be a grave concern. In fact, it is quite clear that the existing causeways have interrupted the sheet flow in this area and thus had an environmental impact. Nevertheless, it is equally clear that the footprint of the causeways at issue in this case has existed since 1942. Moreover, though the foot print [sic] of those causeways will change as a result of this project, there are three important details concerning that change. The most important detail is that the fill will only be placed along the side of the causeways. Therefore, the impact to sheet flow which was the most pervasive concern presented by the Respondents would be de minimis. Secondly, as a result of the change of the bridge design, the bridge spans will be increased. In the areas where the spans are lengthened the resulting unneeded causeway will be removed. Consequently, the project will actually increase sheet flow. Finally, the only significant impact this project will have upon the floodplains is the impact to the wetlands where the fill is placed. However, the evidence clearly shows that [SC]DOT will offset that impact by purchasing 43 acres of land for preservation and debiting 20 credits from its Black River "mitigation bank."

Id. at 28–29, Admin. R. 3472–73. The ALJ further found that the Project "has no negative impact on sheet flow," "is consistent with plans for the national park and will not have an adverse impact[] on federally protected species or critical habitat." Id. at 29 & n.20, Admin. R. 3473.

On September 9, 2008 this Court held a hearing on the parties' motions for summary judgment in Friends of Congaree I and, on September 30, 2008, the Court issued an order finding that, "in its current form," the 2005 EA violated NEPA's "hard look" requirement. Findings of Fact & Conclusions of Law 8, ECF No. 97 (No. 3:06-CV-02538-MBS). The Court did not find that the agencies were required to prepare an EIS before proceeding with the Project, only that, as written, the 2005 EA "lacks the rigorous analysis or references that are required by both the text of NEPA and the mandates of courts interpreting the statute." Id. at 7–8. Accordingly, the Court enjoined the Congaree I Defendants "from further actions on the bridge program until this deficiency is resolved or a new environmental study, either a modified EA or an EIS, is submitted." Id.

After the Court issued its ruling in <u>Friends of Congaree I</u>, the Corps opted to postpone its decision as to whether to issue the Section 404 Permit pending receipt of a revised EA from FHWA. <u>See</u> Dep't of Army Decision Document 27, ECF No. 26-4 at 167. Defendants prepared a revised EA (the "2009 EA"), which was signed on August 18, 2009. <u>See</u> 2009 EA, Admin. R. 3822. The 2009 EA again concluded that the Project would have no significant environmental impact and that, therefore, an EIS was not required under NEPA. <u>See</u> 2009 EA at 1, Admin. R. 3828 ("The project, as proposed, would result in certain modifications to the human and natural environment. However, the [SCDOT] has not identified any significant impacts that would occur based on the data collected, and therefore the project meets the criteria under 23 C.F.R. 771.115(c) for processing as an [EA].").

On April 5, 2010, FHWA issued a new FONSI based on the 2009 EA. <u>See</u> Admin. R. 4928–4938. The Corps issued a thirty-three page decision document the following day, in which it concluded that the Project was unlikely to have any significant environmental impact, issued its own FONSI, and granted Defendants' application. Dep't of Army Decision Document, ECF No. 26-4 at 141–173.[7] In doing so, the Corps noted that the Project was controversial and that it had received several comments objecting to the Project as designed. Ultimately, however, the Corps overruled those objections and issued the permit. Plaintiffs did not challenge the Corps' decision.

Plaintiffs brought the instant action, in which they contend that the 2009 EA is deficient in substantially the same ways that they alleged the 2005 EA was deficient, on September 13, 2010, after the Project was already underway. In connection with Plaintiffs' earlier-filed motion for a

---

[7]     The Section 404 Permit as granted authorized Defendants to "place[] fill material in waters of the U.S. including wetlands for the realignment of the existing Hwy 601 roadway necessary for the replacement of the four functionally obsolete and structurally deficient bridges over the Congaree River and its floodplain . . . ." Dep't of Army Permit 1, ECF No. 27-1 at 1.

preliminary injunction, the parties agreed to submit to an expedited briefing schedule so that the Court could hear and rule on dispositive motions before the next stage of the Project commences. The Plaintiffs, Federal Defendants, and SCDOT Secretary have all filed separate motions for summary judgment, each of which is fully briefed and ready for the Court's ruling.

## II.    APPLICABLE LEGAL STANDARDS

### A.    The National Environmental Policy Act ("NEPA")

NEPA imposes procedural requirements to ensure that federal agencies take a "hard look" at the potential environmental impact of any proposed major federal action that will "significantly affect[] the quality of the human environment," 42 U.S.C. § 4332(2)(C), before undertaking that action. Whether a proposed action will have a "significant" effect on the quality of the human environment "is determined by evaluating both the context of the action and the intensity, or severity, of the impact." Ohio Valley Envtl. Coal. v. Aracoma Coal Co., 556 F.3d 177, 191 (4th Cir. 2009) (citing 40 C.F.R. § 1508.27). The "context" requirement

> means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

40 C.F.R. § 1508.27(a). The "intensity" requirement "refers to the severity of impact," and the regulations set forth ten considerations that an agency should make in evaluating a proposed project's intensity, including "[i]mpacts that may be both beneficial and adverse"; "[u]nique characteristics of the geographic area such as proximity to . . . park lands, . . . wetlands, wild and scenic rivers, or ecologically critical areas"; "[t]he degree to which the action may adversely affect

an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973"; and "[w]hether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment."  40 C.F.R. § 1508.27(b).

If an agency determines that a proposed action is likely to significantly affect the quality of the human environment, NEPA generally requires that the agency prepare a detailed Environmental Impact Statement ("EIS") before proceeding.[8]  NEPA's EIS requirement "serves two purposes":

> First, "[i]t ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts." Second, it "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision."

Dep't of Transp. v. Pub. Citizen, 541 U.S. 752, 768 (2004) (quoting Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989)).  See also Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 129 S.Ct. 365, 376 (2008) ("Part of the harm NEPA attempts to prevent in requiring an EIS is that, without one, there may be little if any information about prospective environmental harms and potential mitigating measures.").  At the other end of the spectrum, if an agency finds that the proposed action will not significantly affect the quality of the human environment, the agency may

---

[8]     "Even where an EA determines that a proposed action will have a significant environmental impact, an agency may avoid issuing an EIS where it finds that mitigating measures can be taken to reduce the environmental impact of the project below the level of significance."  Ohio Valley Envtl. Coal., 556 F.3d at 191–92 (citing Roanoke River Basin Ass'n v. Hudson, 940 F.2d 58, 62 (4th Cir. 1991)); see also Nat'l Audubon Soc'y v. Hoffman, 132 F.3d 7, 17 (2d Cir. 1997) ("When the adequacy of proposed mitigation measures is supported by substantial evidence, the agency may use those measures as a mechanism to reduce environmental impacts below the level of significance that would require an EIS.").

issue a finding of no significant impact (a "FONSI"), and no EIS is required.  See Monsanto Co. v. Geertson Seed Farms, – U.S. –, 130 S.Ct. 2743, 2750 (2010) (citing 40 C.F.R. §§ 1508.9(a), 1508.13).

In those cases "[w]here it is not readily discernible how significant the environmental effects of a proposed action will be, federal agencies may prepare an Environmental Assessment ('EA')." Ohio Valley Envtl. Coal., 556 F.3d at 191 (citing 40 C.F.R. § 1501.4(b)).  An EA is, by definition, a less intensive inquiry than an EIS, because it is meant to be a precursor to the preparation of either an EIS or a FONSI.  There is no universal formula for what an EA must contain and consider, but at a minimum it must "provide sufficient evidence and analysis" supporting the agency's decision to either prepare an EIS or issue a FONSI and "include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E),[9] of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  40 C.F.R. § 1508.9.

Whether issuing an EA or an EIS, the agency's "hard look" must "encompass[] a thorough investigation into the environmental impacts of an agency's action and a candid acknowledgment of the risks that those impacts entail."  Nat'l Audubon Soc'y v. Dep't of Navy, 422 F.3d 174, 185 (4th Cir. 2005).  Mere conclusions, unsupported by evidence or analysis, that the proposed action will not have a significant effect on the environment will not suffice to comply with NEPA.  See Hodges v. Abraham, 253 F. Supp. 2d 846, 854–55 (D.S.C. 2002) (citing Lower Alloways Creek Twp. v. Pub. Serv. Elec. & Gas Co., 687 F.2d 732, 741 (3d Cir. 1982)).  But, provided that the

---

[9]    Section 102(2)(E) has been codified at 42 U.S.C. § 4332(2)(E); it requires that the agency "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).

agency has given the question the requisite "hard look," its "determination that a project will not significantly impact the environment is entitled to substantial deference." Shenandoah Ecosystems Def. Grp. v. U.S. Forest Serv., No. 98-2552, 1999 WL 760226, at *7 (4th Cir. Sept. 24, 1999) (citing Sabine River Auth. v. U.S. Dep't of Interior, 951 F.2d 669, 678 (5th Cir. 1992)).

NEPA "is a procedural and not a results-driven statute." Ohio Valley Envtl. Coal., 556 F.3d at 191. As a result, "even agency action with adverse environmental effects can be NEPA-compliant so long as the agency has considered those effects and determined that competing policy values outweigh those costs." Id. (citing Robertson, 490 U.S. at 350). Federal courts review claims arising under NEPA pursuant to the Administrative Procedures Act (the "APA"), 5 U.S.C. § 706, which authorizes a very narrow standard of review. See Ohio Valley Envtl. Coal., 556 F.3d at 189. The reviewing court may consider only whether the agency took the required "hard look" at the environmental consequences of a proposed project; it may not "substitute its judgment for that of the agency as to the environmental consequences of its actions." Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976). The court is also forbidden from imposing its own preferences regarding methodology or expert opinion: "Agencies are entitled to select their own methodology as long as that methodology is reasonable" and rely on their own experts, even if there is conflicting expert opinion about the potential environmental impact of the action. Hughes River Watershed Conservancy v. Johnson, 165 F.3d 283, 289 (4th Cir. 1999). The court may consider only "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) (quoting Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971)). The court "must take a holistic view of what the agency has done to assess environmental impact . . . [and] may not 'flyspeck' an

agency's environmental analysis, looking for any deficiency, no matter how minor." Nat'l Audubon

Soc'y, 422 F.3d at 186.  Provided that the court determines that the agency took a "hard look" at the

project's potential environmental effects before acting, it must defer to the agency's decision on how

to proceed unless it finds that the decision is "arbitrary or capricious."  See, e.g., Strycker's Bay

Neighborhood Council, Inc. v. Karlen, 444 U.S. 223, 227–28 (1980) (per curiam); Ohio Valley

Envtl. Coal., 556 F.3d at 192; see also Hodges v. Abraham, 300 F.3d 432, 445 (4th Cir. 2002) ("If

the agency has followed the proper procedures, and if there is a rational basis for the decision, [the

court] will not disturb its judgment.").

###### B.    Section 4(f) of the Department of Transportation Act

Section 4(f) of the Department of Transportation Act of 1966 ("Section 4(f)"), 49 U.S.C. §

303, provides, in relevant part, that the Secretary of Transportation

> may approve a transportation program or project . . . requiring the use of publicly
> owned land of a public park, recreation area, or wildlife and waterfowl refuge of
> national, State, or local significance . . . only if—
>
> (1)    there is no prudent and feasible alternative to using that land; and
>
> (2)    the program or project includes all possible planning to minimize the
> harm . . . resulting from the use.

49 U.S.C. § 303(c).  Consistent with the same, where a proposed transportation program or project

"uses" property protected by Section (f), an evaluation must be prepared that considers the two

factors set forth above (i.e., all "prudent and feasible" alternatives to using the Section (f) property

and "all possible planning to minimize . . . harm").  See Hickory Neighborhood Def. League v.

Skinner, 910 F.2d 159, 163–64 (4th Cir. 1990).  Section (f) property is "used":

(1)    When land is permanently incorporated into a transportation facility;
(2)    When there is a temporary occupancy of land that is adverse in terms of the

statute's preservation purpose . . .; or

(3)   When there is a constructive use of a Section 4(f) property as determined by the criteria in § 774.15.

23 C.F.R. § 774.17.

## III.   <u>ANALYSIS</u>

Through their Complaint, Plaintiffs assert the following claims. First, Plaintiffs allege that Defendants' failure to prepare an EIS violated NEPA and the APA, Compl. ¶¶ 46–49 (First Claim for Relief), ECF No. 1. Second, Plaintiffs assert that Defendants "failed to rigorously explore and objectively evaluate a reasonable range of alternatives to the proposed project, and failed to properly assess the alternatives presented in the EA" as required by regulations promulgated by the Council on Environmental Quality (the "CEQ") implementing NEPA and in violation of the APA, <u>id.</u> at ¶¶ 50–53 (Second Claim for Relief). Third, Plaintiffs allege that Defendants failed "to properly consult and coordinate" with interested "federal and state agencies and others," also in violation of NEPA and the APA, <u>id.</u> at ¶¶ 54–58 (Third Claim for Relief). Fourth, Plaintiffs allege that "Defendants failed to analyze adequately the environmental impacts of the US 601 Project, including both direct and indirect impacts," in violation of NEPA and the APA, <u>id.</u> at ¶¶ 59–65 (Fourth Claim for Relief). The above claims necessarily overlap to some extent, but all relate to Plaintiffs' position that Defendants failed to take NEPA's requisite "hard look" at the potential environmental impact of the Project before acting or that, alternatively, if this Court finds that Defendants did take a "hard look" at the impact of the Project, Defendants' decision that an EIS was not warranted was arbitrary and capricious. In addition to their NEPA claims, Plaintiffs separately allege that Defendants failed "to undertake an analysis of feasible and prudent alternatives and undertake all possible planning to minimize harm when a highway project involves publicly owned parks such as Congaree National

13

Park," as required by Section 4(f).  Id. at ¶¶ 66–68 (Fifth Claim for Relief).

### A.    Scientific Analysis and Cumulative Effects Analysis

In support of their claims that Defendants failed to take a "hard look" at the environmental impacts of the U.S. 601 Project, Plaintiffs first argue that Defendants' consideration of the potential environmental impacts of the Project lacked the scientific rigor and high quality of analysis required by NEPA.  Plaintiffs contend that, "Defendants did not conduct one single valid scientific study relating to the environmental impacts of the [P]roject on the Park and the floodplain," in particular the "blockage of sheetflow across the floodplain, disruption of animal migration resulting in deaths, habitat fragmentation and altered hydrology of the floodplain."  Pls.' Summ. J. Mot. 16, ECF No. 95-1.  Plaintiffs do not explain what constitutes a "valid" scientific study, except to argue that, if Defendants had "properly follow[ed] the NEPA process, [they] would [have] evaluate[d] the impacts in light of the best available scientific information, particularly the opinions of the Park Service and the resource agencies, as well as the information provided by the Plaintiffs, which consider the project to have very significant impacts on the environment, and come to conclusions based on that analysis."  Id. at 17.  For the reasons that follow, the Court finds that Defendants took a "hard look" at the potential environmental impact of the Project as required by NEPA and Defendants' decision that an EIS was not required was neither arbitrary nor capricious.

As an initial matter, in evaluating the sufficiency of an agency's scientific analysis under NEPA, courts "grant considerable discretion to agencies on matters 'requir[ing] a high level of technical expertise.'"  Ecology Ctr. v. Castaneda, 574 F.3d 652, 658–59 (9th Cir. 2009) (quoting Marsh, 490 U.S. at 377).  Thus, although a party challenging an agency's decision under NEPA "may cite studies that support a conclusion different from the one the [defendant agencies] reached, it is

14

not our role to weigh competing scientific analyses." Id. (citing Lands Council v. McNair, 537 F.3d 981, 988 (9th Cir. 2008)).[10]  Plaintiffs' assertion that Defendants are "required to explain why the impacts identified by [the] resources agencies are not significant, rebut that evidence, explain inconsistencies and explain how [they] arrived at a contradictory conclusion," is not supported by NEPA caselaw.  See Pls.' Summ. J. Mot. 17, ECF No. 95-1.[11]

Inextricable from Plaintiffs' arguments about the sufficiency of Defendants' analysis of the likely environmental effects of the Project is the question of the proper "baseline" from which Defendants were required to evaluate the Project and the sufficiency of Defendants' "cumulative effects" analysis.  Defendants take the position that "[t]he proper baseline for the Project is the condition of the Highway 601 corridor existing when the EA/FONSI was prepared."  SCDOT's Cross-Mot. Summ. J. 6, ECF No. 99.  In other words,

> The Highway 601 corridor is not a pristine environmental landscape that would be
> significantly altered by the Project.  Instead, the status quo for the Project is as
> [Plaintiffs] acknowledge a "highway crossing [] built through the floodplain . . .
> consist[ing] of four bridges that total 4,113 feet in length and more than three miles

---

[10]    See also Lands Council, 537 F.3d at 988 (explaining that courts do not "act as a panel of scientists that instructs [an agency] how to validate its hypotheses regarding wildlife viability, chooses among scientific studies in determining whether the [agency] has complied with the underlying . . . Plan, and orders the agency to explain every possible scientific uncertainty"); Greenpeace Action v. Franklin, 14 F.3d 1324, 1333 (9th Cir. 1992) ("To set aside the [agency]'s determination in this case would require us to decide that the views of the [plaintiff]'s experts have more merit than those of the [agency]'s experts, a position we are unqualified to take.").

[11]    The case upon which Plaintiffs rely in their motion for summary judgment, E.I. du Pont De Nemours & Co. v. Train, 541 F.2d 1018 (4th Cir. 1976), involved the review of several regulations promulgated by the Administrator of the Environmental Protection Agency under the Federal Water Pollution Control Act Amendments of 1972.  Id. at 1024.  The action did not involve NEPA, an EA, or an EIS.

of earthen causeways or embankments created by filling floodplain wetlands."

Id. at 7 (quoting Pls.' Summ. J. Mot. 4, ECF No. 95-1).

Plaintiffs take a slightly different position, arguing that Defendants were required "to evaluate past impacts related to historical actions in its cumulative impacts analysis," and that Defendants' present-day baseline approach was insufficient under NEPA. Pls.' Resp. 17, ECF No. 104. In support, Plaintiffs cite the CEQ regulations that require an agency to evaluate the "cumulative impact" of the proposed action. See 40 C.F.R. §§ 1508.7, 1508.35. The CEQ regulations explain that

> [A] [c]umulative impact is the impact of the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions. Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.

40 C.F.R. § 1508.7. Plaintiffs argue that, pursuant to these regulations, Defendants were required to engage in meaningful analysis of the past impacts "of the damming effects of the embankments on the floodplain, the inhibition of nutrient transport across the floodplain, the fragmentation of wildlife habitat, blockage of sheetflow across the floodplain or the loss of habitat," and that failure to do so violated NEPA. Pls.' Resp. 17, ECF No. 104.

The Court must consider this argument in light of the purpose of NEPA's "hard look" requirement. Viewed through that lens, the relevant question is whether Defendants considered and discussed past environmental harms "in sufficient detail to promote an informed assessment of environmental considerations and policy choices by the public and agency personnel[.]" Lands Council v. Powell, 395 F.3d 1019, 1028 (9th Cir. 2005); see also Shenandoah Ecosystems, 1999 WL

760226, at *4 n.2 (holding that whether a particular agency properly considered the cumulative impacts is a "case-by-case analysis").  None of the cases cited by Plaintiffs can be read to require an agency, in conducting a cumulative impacts analysis, to prepare an EA measuring the potential environmental impacts of a project from a historical baseline that was significantly altered by conduct more than sixty years past.  For example, in <u>Lands Council v. Powell</u>, the Ninth Circuit considered an EIS prepared by the United States Forest Service (the "Service") for a timber harvest proposed as part of a "watershed restoration" project in the Idaho Panhandle National Forest.  395 F.3d at 1024.  Unlike the Project at issue in the instant action, the <u>Lands Council</u> project was designed with the express purpose of "restor[ing] nature's balance in . . . the Project area" from its current condition, which was the result of "past environmental degradation."  <u>Id.</u> at 1025.  As part of the project, the Service proposed harvesting 17.5 million board feet of commercial lumber from 1,408 acres by the "shelterwood" method of harvesting.  <u>Id.</u>[12]  The plaintiffs challenged the Service's decision, arguing, in part, that the Service's cumulative effects analysis in the EIS was insufficient because it failed to "note in detail past timber harvesting projects and the impact of those projects on the . . . watershed."  <u>Id.</u> at 1027.  On appeal, the Ninth Circuit agreed with the plaintiffs, finding that the Service's failure to address the methods of prior harvests and the effects of each "would not aid the public in assessing whether one form or another of harvest would assist the planned forest restoration with minimal environmental harm."  <u>Id.</u> at 1028.  The court added that this information "was not difficult data to generate, as is apparent by the . . . Service's response to the Freedom of Information Act request from [the plaintiffs]."  <u>Id.</u> at 1028 n.6.  In contrast, the Project is not meant

---

[12]    "Shelterwood harvesting" is a particular type of harvesting timber that "cuts the majority, but not all, of the trees in a given harvesting site."  <u>Lands Council</u>, 395 F.3d at 1025 n.4.

to address and remedy prior environmental degradation.  Moreover, the Plaintiffs seek not the inclusion of data already readily available, but environmental studies regarding the impact of actions completed more than 65 years in the past.[13]

The Court is unaware of any authority for finding an EA inadequate because an agency chose, as the baseline from which to measure the potential impacts of a proposed project, the environment in its current condition.  Moreover, a memorandum issued in June 2005 by CEQ's Chairman advises that "[t]he environmental analysis required under NEPA is forward-looking, in that it focuses on the potential impacts of the proposed action that an agency is considering."  JAMES L. CONNAUGHTON, COUNCIL ON ENVIRONMENTAL QUALITY, GUIDANCE ON THE CONSIDERATION OF PAST ACTIONS IN CUMULATIVE EFFECTS ANALYSIS 1 ("CEQ CUMULATIVE EFFECTS ANALYSIS MEMO") (2005),

---

[13]    Nor can the other cases relied upon by Plaintiffs be read to require an in-depth environmental evaluation of the harm done to the floodplain by the decision to build the original bridges and highway corridor.  At issue in Kern v. U.S. Bureau of Land Management, 284 F.3d 1062 (9th Cir. 2002), was the Bureau of Land Management's preparation of an EA related to proposed sales of timber, which did not include any cumulative impact analysis of "reasonably foreseeable future actions" that, "in combination with the [proposed] timber sales, could constitute 'collectively significant actions . . . over a period of time.'" Id. at 1075 (quoting 40 C.F.R. § 1508.7).  Similarly, Neighbors of Cuddy Mountain v. U.S. Forest Service, 137 F.3d 1372 (9th Cir. 1998), involved the Forest Service's approval of proposed sale of timber in an area where three other timber sales were also proposed.  Id. at 1378.  The issue was whether, in its analysis of the potential environmental impact of the proposed sale, the Forest Service had provided significant details regarding the extent to which current and future actions would impact the environment, not whether prior actions had an adverse impact on the environment or whether environmental harms previously caused might be remediated by the current project.  Finally, Oregon Natural Desert Ass'n v. Green, 953 F. Supp. 1133 (D. Or. 1997), involved a specific statutory mandate found in the Wild and Scenic Rivers Act (the "WSRA"), not at issue in the instant case.  See id. at 1147 ("The WSRA sets forth affirmative duties on the part of federal agencies . . . . The River Plan here purports to authorize cattle grazing in accordance with the strictures of the WSRA; that involves distinctly different considerations from prior decisions to allow grazing.").

http://ceq.hss.doe.gov/nepa/regs/Guidance_on_CE.pdf.   It further advises that, "[i]n determining what information is necessary for a cumulative effects analysis, agencies should . . . focus on the extent to which information is 'relevant to reasonably foreseeable significant adverse impacts,' is 'essential to a reasoned choice among alternatives,' and can be obtained without exorbitant cost." Id. (citing 40 C.F.R. § 1502.22).   To this end, "[a]gencies are not required to list or analyze the effects of individual past actions unless such information is necessary to describe the cumulative effect of all past actions combined," and "[g]enerally, agencies can conduct an adequate cumulative effects analysis by focusing on the current aggregate effects of past actions without delving into the historical details of individual past actions." Id. at 2. The agency's decision as to the extent of the inquiry into cumulative effects, the appropriate level of explanation, and the procedure it uses to consider such effects are all entitled to the substantial deference accorded an agency's determination in an area involving a high level of technical expertise. Id.; see also League of Wilderness Defenders-Blue Mountains Biodiversity Project v. U.S. Forest Serv., 549 F.3d 1211, 1218 (9th Cir. 2008). The CEQ Chairman's interpretation of the regulations is consistent with the United States Supreme Court's understanding of NEPA as a forward-looking, not remedial, statute. See Metro. Edison Co. v. People Against Nuclear Energy, 460 U.S. 766, 779 (1983) (holding that NEPA "does not create a remedial scheme for past federal actions," instead "[i]t was enacted to require agencies to assess the future effects of future actions.").

      Having carefully reviewed the 2009 EA and the relevant portions of the record, the Court finds that Defendants' cumulative effects analysis was sufficient under NEPA. The 2009 EA summarizes the historical use of the Project area, explaining that while existing development in the area is very limited, the area has been utilized as a transportation corridor since the early 1900's.

2009 EA at 2, Admin. R. 3829. "[T]he surrounding landscape has not greatly changed over the past 150 years," and the Project area itself "has changed very little over the past 65 years," since the original bridges were built. Id. at 3, 15, Admin. R. 3831, 3842. As such, the EA treats the present condition of the environment as the baseline from which it measures the potential environmental impact of the Project. Given the amount of time that passed between the original construction of the bridges and highway and the proposed Project, Defendants' decision to limit their analysis to evaluating the potential impact the Project would have on the environment in its current state was not arbitrary or capricious.[14]

Because the Court decides that Defendants' decision to evaluate the potential environmental effects of the Project from the present day baseline was not arbitrary or capricious, Plaintiffs' other arguments regarding the adequacy of Defendants' environmental analysis similarly fail. For instance, Plaintiffs argue that Defendants failed to conduct any scientific studies related to the effect that the Project would have on the blockage of sheetflow across the floodplain, but at the Administrative Hearing even the Plaintiffs' own expert Dr. Daniel Tufford opined that the Project would result in an "ever so slight[]" increase in floodplain sheetflow. ALJ Hr'g Tr. 793:6–794:19,

---

[14]    Other courts have reached similar conclusions when faced with analogous circumstances. For example, in Sierra Club v. Hassell, 636 F.2d 1095 (5th Cir. 1981), the Fifth Circuit held that rebuilding a destroyed bridge on essentially the same alignment over wetlands and floodplains "does not significantly alter the status quo," because "[t]he reconstruction project will only restore an environmental situation that had existed for twenty-four years" and that, therefore, the FHWA's and Coast Guard's determination that an EIS was unnecessary, was not unreasonable. Id. at 1097, 1098, 1099. See also Citizens for the Scenic Severn River Bridge, Inc. v. Skinner, 802 F.Supp. 1325, 1333 (D. Md. 1991) (finding agency's classification of project as a bridge replacement project not requiring an EIS was not arbitrary and capricious even where the replacement bridge would be longer and built at a different site).

798:16–23, Admin. R. 2974–2975, 2979. Similarly, Plaintiffs challenge Defendants' conclusion that the Project would have no significant effect on animal migration. However, in comparing the proposed Project to the present conditions with the original roadway, the EA describes measures that have been taken "to provide an increased opportunity for safe wildlife movement." 2009 EA at 25, Admin. R. 3853.

Plaintiffs do not take issue with these conclusions. Instead, they argue that the Project did not go far enough in addressing their concerns and the concerns of several resource agencies as expressed in a March 2006 letter in which the National Park Service ("NPS") argued that the Project "would continue to impact the natural flow of flood waters and nutrients across park wetlands, and would continue to restrict the wildlife movement across the floodplain." Pls.' Summ. J. Mot. 8, ECF No. 95-1 (quoting Letter from Lewis Prettyman, Acting Superintendent, NPS to Stephen A. Brumagin, Dep't of the Army (Mar. 6, 2006), Admin. R. 3268).[15] Plaintiffs' argument assumes that NEPA requires that Defendants conduct scientific studies with an eye to restoration of the floodplain before the bridges and highway were built in the 1940's. If the Project were a floodplain restoration project, that may have been the case. However, the Project is a road and bridge replacement project and NEPA requires only that Defendants take a "hard look" at the potential environmental effects

---

[15]    See also Pls.' Summ. J. Mot. 9–10, ECF No. 95-1 (noting that the South Carolina Department of Natural Resources also submitted comments expressing its opinion that the Project "will continue to negatively impact the Congaree River floodplain," and that "there is potential for significant improvements in the Congaree floodplain [that could be gained] by modifying the project design" such as "improv[ing] connectivity through the system, restor[ing] natural hydrology, improv[ing] wildlife passage, and minimiz[ing] habitat fragmentation") (quoting Letter from Robert E. Duncan, Environmental Programs Director, S.C. Dep't of Natural Resources to Steve Brumagin, Corps of Engineers, (Aug. 4, 2005) Admin. R. 1332).

of the particular project proposed.

Plaintiffs similarly argue that Defendants failed to take a "hard look" at the Project's potential impact on hydrology, floodplain, and wetland function. These issues were considered by the Corps in deciding whether to issue the Section 404 Permit and, in determining whether to issue the permit, the Corps was bound by both NEPA and the CWA. See Ohio Valley Envtl. Coal., 556 F.3d at 207; see also White Tanks Concerned Citizens, Inc. v. Strock, 563 F.3d 1033, 1036 (9th Cir. 2009) ("A Section 404 permit is a major federal action requiring review under [NEPA]."). Although these statutory schemes overlap, they are not identical. For example, unlike NEPA, the CWA imposes substantial environmental standards. Bering Strait Citizens for Responsible Res. Dev. v. U.S. Army Corps of Eng'rs, 524 F.3d 938, 947 (9th Cir. 2008).[16] Moreover, the scope of the environmental review that the Corps must conduct prior to issuing a Section 404 permit is dictated by NEPA, not the CWA. As the Ninth Circuit recently explained:

> It is important . . . to understand the difference between the jurisdiction of the Corps under the CWA, which is limited to "waters of the United States," and the scope of analysis required in an environmental evaluation under NEPA. . . . The scope of the environmental review under NEPA . . . must be dictated by the environmental effects triggered by the filling of [the relevant waters].

---

[16] Pursuant to the Section 404 regulations, the Corps must make determinations as to the potential short-term or long-term effects of proposed fill on the physical, chemical, and biological components of the aquatic environment, including specific determinations about the effect on the flow of water in the area and "the nature and degree of effect that the proposed [fill] will have, both individually and cumulatively, on the structure and function of the aquatic ecosystem and organisms." 40 C.F.R. § 230.11. The Corps may not issue a 404 Permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge [of fill material] on the aquatic ecosystem." 40 C.F.R. § 230.10(d).

White Tanks Concerned Citizens, 563 F.3d at 1039.[17]

In the instant case, after receiving and reviewing multiple objections related to the proposed Project, the Corps ultimately found that the Project would have no significant environmental impact, issued a FONSI, and approved the permit application in the Spring of 2010. The Corps' environmental analysis addressed the impact that filling the wetlands was expected to have on wetland function, floodplain function and hydrology. The Corps found that "the floodplain would maintain the same functions as currently exists"; the wetlands that Defendants would restore as part of the Project "will mitigate impacts to floodplain functions (flood attenuation, sediment retention, and nutrient uptake) and will not be significantly different from existing conditions"; and the proposed Project "would have larger waterway openings that are expected to cause a slight reduction . . . in backwater . . . . [which] will result in a slight improvement in the hydraulic efficiency of these structures and . . . should improve flow dispersion throughout the floodplain over the existing conditions." Dep't of Army Decision Document 10, ECF No. 26-4 at 150. Plaintiffs have not challenged the Corps' FONSI and the Corps is entitled to deference for questions such as these, which involve specialized knowledge within its purview.[18]

---

[17]    Ohio Valley Environmental Coalition v. Aracoma Coal Co., 556 F.3d 177, 195–96 (4th Cir. 2009), is not to the contrary. There, the Fourth Circuit held that the Corps was not required to consider the environmental impacts of an entire valley fill project, where such a requirement would "effectively read out of the equation the elaborate, congressionally mandated schema for the permitting of surface mining operations prescribed by [the Surface Mining Control and Reclamation Act ('SMCRA')]." Id. at 194–95. Under the circumstances of that particular case, all of the fill activity in areas other than the navigable waters of the United States fell under the exclusive jurisdiction of the federally approved state SMCRA regulatory authority. Id.

[18]    Having not challenged the Corps' findings, Plaintiffs are not now entitled to a presumption that the Corps' decision violated NEPA.

Finally, Plaintiffs submit that the fact that the Project is located on land surrounded by the Congaree National Park required Defendants to "take particular care to evaluate how [their] actions will affect the unique biological features of this congressionally protected area." Pls.' Summ. J. Mot. 28, ECF No. 95-1 (quoting Nat'l Audubon Soc'y, 422 F.3d at 187). Plaintiffs argue that the EA was insufficient in this regard, because it "pays little heed to Congaree National Park, failing to consider: the impacts of the project in the context of the functioning of the Park ecosystem, the reasoning for Congress's designation of the Park and how this Project will diminish those values, and the visitors to Park land and how their use will be affected." Id. at 29.

Plaintiffs, however, fail to identify how a project replacing bridges and highway corridors that have been in the same approximate location for more than sixty-five years either would diminish the values that Congress sought to protect in designating the Park or affect the use of the Park by visitors. Furthermore, after careful review of the 2009 EA and the relevant portions of the record, the Court finds that Defendants' analysis sufficiently considered the effect that the Project would have on the relevant environment and that their conclusion of no significant environmental impact was not arbitrary or capricious.

### B.    Consultation and Coordination with Other Agencies

Plaintiffs further contend that the 2009 EA "fails to comply with the basic NEPA requirement that agencies evaluate a project based on . . . 'expert agency comments'"; that Defendants failed "to give any meaningful consideration to the serious concerns raised by [the resource agencies]"; and that, at best, Defendants engaged in only "empty" coordination efforts, in violation of NEPA. See Pls.' Summ. J. Mot. 25, 37, ECF No. 95-1. As with the argument regarding the sufficiency of Defendants' analysis addressed above, Plaintiffs again rely on objections to the Project made by

resource agencies—i.e., that "the project is inconsistent with Park plans; it would continue to negatively impact the Congaree River floodplain; it perpetuates existing adverse impacts via new construction; and it does not restore and preserve hydrological flows or otherwise restore beneficial floodplain values." Id. at 25–26. Plaintiffs argue that Defendants violated NEPA by not giving "meaningful consideration" to these concerns as reflected by the fact that "[t]he plan for the project was not modified and no alternatives were evaluated in response to these concerns." Id. at 37.

Plaintiffs' argument is without merit for several reasons. First, as discussed above, the agency objections relied upon by Plaintiffs reflect a preference by those agencies that Defendants use the Project as an opportunity to remediate damage done to the environment more than sixty years hence. Even were that not the case, while NEPA provides that an agency "should consider the comments of other agencies" in deciding whether an EIS should be conducted, "it need not defer to them when it disagrees." Roanoke River Basin, 940 F.2d at 64. Moreover, there is ample evidence in the record that Defendants met with the resource agencies on many occasions to address their concerns and ultimately did make changes to the Project based on the input they received. For example, Defendants agreed to a seasonal moratorium on in-water construction activities in order to mitigate any potential adverse impacts the project might have on Atlantic Shortnosed Sturgeon. See EA at Appx. B, Admin. R. 3901. Defendants also ultimately agreed to incorporate two additional bridge spans into the Project design, directly in response to concerns from resource agencies. See Admin. R. 3704.

### C.    Controversial Nature of the Project

Plaintiffs also argue that the Court should find that Defendants' decision not to issue an EIS violated NEPA, because the Project "is highly controversial."  Pls.' Summ. J. Mot. 29, ECF No. 95-1.  In support, Plaintiffs cite Foundation for North American Wild Sheep v. U.S. Dep't of Agriculture, 681 F.2d 1172 (9th Cir. 1982), and the CEQ regulations, which provide that one of the factors that an agency must consider in determining whether a proposal has a significant impact on the human environment, and thus requires the preparation of an EIS, is "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial."  40 C.F.R. § 1508.27(b)(4).

In Foundation for North American Wild Sheep, the Ninth Circuit held that the Forest Service's decision not to prepare an EIS for reconstruction of a road that passed through an environmentally sensitive area was unreasonable.  681 F.2d at 1174.  The road at issue had been in use from 1933 until 1969, when heavy flooding rendered it impassable.  Id. at 1175.  The road remained closed until 1980 when it was repaired by a private landowner "sufficiently to permit vehicular traffic."  Id.  The suit surrounded the landowner's application to the Service for a permit "to clear [the road] of vegetation, widen it to twelve feet where necessary, and repair washed-out areas."  Id.  The road "passe[d] directly through [an] area occupied by one of the few remaining herds" of a protected species of sheep that "are purportedly extremely sensitive to environmental change."  Id.  As a result, the landowner's application incurred substantial protest from environmentalists as well as "highly critical responses" from the State Department of Natural Resources and Department of Fish and Game.  Id. at 1175 n.10.  Despite these objections, the Service issued the permit based on an EA in which it determined that, because the proposed project

26

"adequately mitigated the potential harm to the sheep, the action would have no significant effect on the quality of the human environment and therefore no EIS was required." Id. at 1176.

The Ninth Circuit reversed the district court's decision that the Service's determination that no EIS was required was reasonable based on its finding that the EA "failed to address certain crucial factors, consideration of which was essential to a truly informed decision whether or not to prepare an EIS." Id. at 1178. The court was particularly concerned about the EA's "failure to include any estimate of the expected amount of truck traffic on [the road]," explaining that "[w]e fail to see how the effect of reopening [the road] can be evaluated intelligently without some consideration of the amount of traffic likely to flow along the road." Id.[19] The fact that the Service "received numerous responses from conservationists, biologists, and other knowledgeable individuals, all highly critical of the EA and all disputing the EA's conclusion that reopening [the road] would have no significant effect on the . . . sheep" was cited by the court as evidence "supporting" its conclusion that the Service was unreasonable in failing to prepare an EIS. Id. at 1182.

The instant action is distinguishable from Foundation for North American Wild Sheep. The road and bridges at issue here have been in constant use since the 1940's and Plaintiffs do not dispute Defendants' findings that the Project will not result in any meaningful increase in traffic. Furthermore, the fact that there is opposition to a particular project does not render it "controversial" within the meaning of the CEQ regulations. See State of N.C. v. FAA, 957 F.2d 1125, 1133–34 (4th

---

[19]     The court also noted that the California State agencies had raised "serious questions" that the Service failed to address regarding the effect of the road's traffic on the health and welfare of the sheep, including their use of a salt lick located close to the road; the effect that the traffic could have on the sheep's mortality due to their susceptibility to stress-related disease; and the sheep's tolerance of human intrusion upon their habitat. Found. for N. Am. Wild Sheep, 681 F.2d at 1178–79.

Cir. 1992) (affirming decisions holding that "controversial" does not necessarily equate with "opposition" because to so hold would allow "opposition, and not the reasoned analysis set forth in an [EA] . . . [to] determine whether an [EIS] would have to be prepared" and create a "heckler's veto"). The objections raised by both Plaintiffs and the resource agencies are largely related to their preference that the Project be used to remediate environmental damage long since occurred. To the extent that Plaintiffs' objections are based on concerns about further damage that the Project will cause to the environment, the Court previously found that those objections are at odds with the determinations of the Corps and Defendants, which are not arbitrary or capricious. As such, the Court finds that the objections to the Project cited by Plaintiffs are not sufficient to render arbitrary and capricious Defendants' decision that preparation of an EIS was not necessary.

    **D.    Alternatives Analysis**

    In order to ensure that agencies take a "hard look" at the potential environmental effects of their actions, NEPA specifically requires that, before commencing a major federal action, agencies engage in an alternatives analysis, "identify[ing] and assess[ing] the reasonable alternatives to proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment." 40 C.F.R. § 1500.2(e). Plaintiffs argue that the alternatives analysis set forth in the 2009 EA was inadequate under NEPA. Specifically, Plaintiffs argue that the EA should have included discussion of "other 'middle ground' alternatives," instead of only "four simplistic[,] impractical options" and Defendants' "chosen alternative." Pls.' Summ. J. Mot. 34, ECF No. 95-1. Plaintiffs' motion does not identify the other alternatives that they believe Defendants should have considered, except to argue that the alternatives would have involved "additional bridging" and that, "[i]n other projects, the [SCDOT] has opted to span floodplains with bridges in recognition of

28

FHWA policy to 'avoid significant encroachment, where practicable' and to 'restore and preserve the natural and beneficial floodplain values that are adversely impacted by highway agency actions.'" Id. (quoting 23 C.F.R. § 650.103(c) & (d)). Plaintiffs further allege that, before the EA process began, "[SC]DOT had already decided the design plans it intended to use," as evidenced by a March 2003 memo that "lays out practically the exact design as it was 'chosen' in the EA and directs its recipient to begin preparing a design." Id. at 35–36. This, Plaintiffs argue, proves that Defendants violated NEPA's mandate that the environmental analysis be "taken objectively and in good faith, not as an exercise in form over substance, and not as a subterfuge designed to rationalize a decision already made." Id. at 34–35 (quoting Metcalf v. Daley, 214 F.3d 1135, 1142 (9th Cir. 2000)).

Plaintiffs' arguments are not supported by the record or the law. First, contrary to Plaintiffs' assertions, the EA does advise that consideration was given to bridging the entire length of the floodplain before rejecting it for cost and convenience reasons.[20] Second, NEPA does not require that an EA engage in a full blown detailed analysis of all potential alternatives. As the Ninth Circuit has explained,

> This "alternatives provision" . . . requires the agency to give full and meaningful consideration to all reasonable alternatives. However, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS." Thus, whereas

---

[20]    See 2009 EA at 13, Admin. R. 3840 ("Consideration was given to removing the existing 3 miles of roadway embankment located within the floodplain and bridging the entire length. This would require the closure of the road for an extended period of time and greatly impact the traveling public. Additionally the cost of the continuous structure would be approximately $90 million. Due to this option being beyond the purpose and need of the project, it was eliminated from further consideration."); see also Fed. Defs.' Cross-Mot. Summ. J. 27, ECF No. 100-1 ("Constructing the additional bridging urged by Plaintiffs would . . . convert[] it to an ineligible project [under the Highway Bridge Replacement and Rehabilitation Program, which provided the funding for the U.S. 501 Project], and requir[e] a different source of funding.").

with an EIS, an agency is required to "[r]igorously explore and objectively evaluate all reasonable alternatives," with an EA, an agency only is required to include a brief discussion of reasonable alternatives.

N. Idaho Cmty. Action Network v. U.S. Dep't of Transp., 545 F.3d 1147, 1153 (9th Cir. 2008) (internal citations omitted).  Whether an alternative is "appropriate" or "reasonable," such that it should have been considered in an agency's EA or EIS, "depends on the 'nature and scope of the proposed action.'"  Native Ecosystems Council v. U.S. Forest Serv., 428 F.3d 1233, 1246–47 (9th Cir. 2005) (quoting Cal. v. Block, 690 F.2d 753, 761 (9th Cir. 1982)).  "[A]n agency is not required to consider alternatives which are 'infeasible, ineffective, or inconsistent with basic policy objectives' for the action at issue."  State of S.C. ex rel. Campbell v. O'Leary, 64 F.3d 892, 900 (4th Cir. 1995) (citing Headwaters, Inc. v. Bureau of Land Mgmt., 914 F.2d 1174, 1180 (9th Cir. 1990)); see also Sierra Club v. U.S. Army Corps of Eng'rs., 935 F. Supp. 1556, 1576 (S.D. Ala. 1996) (finding an alternative that "would have more than doubled the cost of the construction project and which would have posed substantial logistical problems for construction" was not reasonable).  "Nor is an agency required to undertake a 'separate analysis of alternatives which are not significantly distinguishable from alternatives actually considered, or which have substantially similar consequences.'"  Westlands Water Dist. v. U.S. Dep't of Interior, 376 F.3d 853, 868 (9th Cir. 2004) (quoting Headwaters, 914 F.2d at 1181).

As for Plaintiffs' claim that Defendants preferred from the Project's inception the approach that they ultimately chose, such preference alone does not run afoul of the law.  NEPA "does not require that agency officials be 'subjectively impartial,'" only that "projects be objectively evaluated."  Metcalf, 214 F.3d at 1142.  In fact, "NEPA assumes as inevitable an institutional bias within an agency proposing a project and erects the procedural requirements . . . to insure that 'there

30

is no way [the decision-maker] can fail to note the facts and understand the very serious arguments advanced by [other interested parties] . . . .'" Envtl. Def. Fund v. Corps of Eng'rs, 470 F.2d 289, 295 (8th Cir. 1972) (quoting Envtl. Def. Fund v. Corps of Eng'rs, 342 F. Supp. 1211, 1218 (E.D. Ark. 1972).

There is ample evidence in the record to support a finding that Defendants engaged in a good faith and objective analysis of the reasonable alternatives. Indeed, ultimately, Defendants adopted some changes to the Project design, including adding approximately 250 feet of bridging at an estimated cost of $1.2 million as a result of suggestions of alternatives made by other agencies. See Fed. Defs.' Cross-Mot. Summ. J. 25–26, ECF No. 100-1 (discussing alternatives considered with citations to the record); see also Letter From Robert L. Lee, FHWA Division Administrator, To Tracy Swartout, Congaree National Park (Apr. 17, 2009), Admin. R. 3704 (discussing recommendations made by the Park and explaining that additional bridging will be added to the Project in response to the Park's concerns). There is no basis for this Court to find that Defendants' conclusion that consideration of other alternatives was not warranted due to their cost, relatively negligible benefit, or similarity to other alternatives considered, was arbitrary or capricious.

### E.     Section 4(f) Assessment

Separate from their claims that Defendants violated NEPA, Plaintiffs allege that Defendants violated Section 4(f) of the Department of Transportation Act. Specifically, Plaintiffs contend that the Project "constructively" uses land in the Congaree National Park and that, therefore, Defendants were required to prepare a Section 4(f) evaluation addressing that use.[21] The basis for Plaintiffs'

---

[21]     SCDOT did prepare a Section 4(f) Evaluation, which concluded that the only 4(f) property impacted by the Project is the Bates Bridge Landing, a boat landing located in the SCDOT's right-of-way, but managed by the South Carolina

argument is that, due to recent acquisitions of land by the Congaree National Park,

> Park land now directly abuts approximately 1.75 miles of the Highway 601 right-of-way through which the project is being built . . . .  The Highway 601 right-of-way extends a minimum of 100 feet and a maximum of 300 feet out from Highway 601, meaning that over half the length of the disputed construction project is occurring within 100 yards of Park land.

Pls.' Summ. J. Mot. 39, ECF No. 95-1.  Plaintiffs particularly object to Defendants' conclusory

determination "that despite its proximity to the Congaree National Park . . . , the project does not

substantially impair the Park[.]"  Id. at 40.

Plaintiffs have failed to demonstrate that Defendants violated Section 4(f).  First, by its terms,

Section 4(f) is only triggered by projects that "use" land protected by the statute.  It is undisputed that

the Project does not actually use Park land.  At issue is Defendants' determination that the Project

did not "constructively" use Park land.  In determining whether a particular project constructively

uses Section (f) property, "mere proximity to a protected resource is not enough."  Florida Keys

Citizens Coalition, Inc. v. U.S. Army Corps of Eng'rs, 374 F. Supp. 2d 1116, 1153 (S.D. Fla. 2005).

Instead, the test focuses on the severity of the effects of the project on the protected land.  The

relevant regulations provide that,

> A constructive use occurs when the transportation project does not incorporate land from a Section 4(f) property, but the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify the property for protection under Section 4(f) are substantially impaired. Substantial impairment occurs only when the protected activities, features, or attributes of the property are substantially diminished.

------

> Department of Natural Resources.  See 4(f) Evaluation, Admin. R. 3880. Plaintiffs do not challenge the adequacy of the evaluation prepared with regard to the Bates Bridge Landing; instead, Plaintiffs argue that the evaluation should have also addressed the potential impact of the Project on Congaree National Park lands.  See Pls.' Summ. J. Mot. 39, ECF No. 95-1.

23 C.F.R. § 774.15(a). The regulations further provide that, "[t]he Administration shall determine when there is a constructive use, but the Administration is not required to document each determination that a project would not result in a constructive use of a nearby Section 4(f) property." 23 C.F.R. § 774.15(c). "[S]uch documentation may be prepared at the discretion of the Administration." Id.

Consistent with the above-cited regulations, Plaintiffs' complaint that "Defendants' 4(f) evaluation flatly states that despite its proximity to the Congaree National Park . . . , the project does not substantially impair the Park such as to constitute a constructive use," Pls.' Summ. J. Mot. 40, ECF No. 95-1, is not legally meaningful. Defendants are authorized to make a determination that a project will not result in a constructive use of nearby Section 4(f) property and need not document that determination. Moreover, to the extent that Plaintiffs intend to challenge the agency's determination that the Project does not "use" protected land, Plaintiffs bear the burden of demonstrating that Park land will be "constructively used" by the Project. See Florida Keys Citizens Coalition, 374 F. Supp. 2d at 1153. As noted, the mere proximity of Park land to the Project is not enough to trigger Section 4(f). Plaintiffs fail to set forth any additional evidence upon which this Court could conclude that Defendants' determination that the Project will not substantially impair Park land was arbitrary or capricious.

## VI.     **CONCLUSION**

For the reasons discussed above, the Court **DENIES** Plaintiffs' motion for summary judgment, ECF No. 95, and **GRANTS** Defendants' cross-motions for summary judgment, ECF Nos. 99 & 100.

IT IS SO ORDERED.

/s/ Margaret B. Seymour
United States District Judge

April 27, 2011
Columbia, South Carolina